Good morning, Your Honors. Good morning. I may have pleased the Court. My name is Stan Gibson, and it's my privilege to represent the Appellant Farmer's Insurance Company of Newark in this matter. I would like to reserve five minutes for rebuttal. This appeal presents a basic legal question of marine insurance, and the basic legal question is, is the owner, the identity of an owner of a vessel in an application or requested an application for marine insurance, is the identity of the owner a material fact? If it is a material fact and was not provided in the signed application, then regardless of the intent or the reasons why it wasn't provided, the good faith, the mistake, it doesn't matter, the underwriter is entitled under marine law in Section 1900 of the California Marine Insurance Code to rescind that policy. It is undisputed in the record that the applicant for insurance was not the owner of the boat, was not the registered owner of the boat, did not hold title to the boat, and it's undisputed that this person never told the ---- Isn't it also undisputed effectively that McKeeting told the insurance representative that called him what the actual relationship was between him and the title holders? Absolutely not, Your Honor. That's what the district court found. I agree, and that's clearly erroneous. What makes it erroneous? The timing is key. There was an initial telephone call in which they said, okay, he said, I'm buying this on an installment contract, and I don't remember whether I told him we have the title or not, and they said, well, we consider you the owner, December 1999. In March of 2000, Mr. McKeeting entered into a new agreement with the two owners, designated him as charterer, requiring him to post on the mast of the vessel that he was the charterer, not the owner, and then later on he got a visit after December 2000, he got a visit from the owner saying, hey, you're trashing my boat. The sign isn't posted up there. I'm the owner. You're just the charterer. And then he called the BoatUS again on January 5th and said, gee, I better get insurance, and they asked him, had anything changed? Had anything changed? He said no. Now, we have the application that they have prepared for the initial telephone conversation. In December of 1999 and later, March 2000, whatever, who was the owner? Who was the owner? The DeWolfe's were always the owner. It's an agreed fact. The entire time of this litigation. That was told to the insurance company the identity of the owner had not changed. Absolutely not, Your Honor. And he disclosed that in the telephone conversation with the agent of the insurance. He said he was buying. The record is not that way, Your Honor. He said he was buying, he was in the process of buying the vessel from the DeWolfe's. That was the conversation. That's what the Court found. Later on, he signed a new agreement. He never informed the agent in the later conversation of that new agreement. And the new agreement is the bareboat charter, and it's at ER 100, and at ER 125 requires him to post on the mass, requires him to insure the vessel and name the DeWolfe's insured. That agreement came in March 2000. At that time, he had never submitted a signed application. The signed application didn't come until January 8, 2001. The timeline is very important. And during the first conversation, the second conversation, and the signed application, the bareboat charter was executed, and Mr. McKinney said nothing had changed. And that was material to the risk? Absolutely. The district court found it wasn't. The district court was in error, Your Honor, respectfully. What makes it an error? It makes it an error because the underwriter, under the law, as this Court has held, and the CNR Acton case, and under 1900, and under the Malone case, the owner, when it's requested, the identity of the owner is requested in an application, that is material. And it's the subjective belief of the underwriter that counts, not the subjective belief of the person applying for insurance. And that's what this Court has also held. But wasn't there testimony that even if the insurance company had known this was a charter relationship, that insurance would have still been written? There was no such testimony, Your Honor. I challenged in my opening brief the other side to come up with any evidence in the record of a bareboat charter. Mr. Underwriter, if you had known this was a bareboat charter, wouldn't you have insured it anyway? In fact, the only evidence is if he had been told it was a bareboat charter, it would have been no. We only insure owners. Did the underwriter testify? Did the underwriter ñ what evidence was there from the underwriter? The head of insurance underwriting at Boat U.S., who was the one who helped develop the application, was the one who testified. And he testified as to what their policies were with respect to that. And it's clear, if it's in the application, it's material.  Well, everything in the ñ you're not making the argument that everything in the application is material, are you? I think there is law to state that. If you put ñ if it's requested by an underwriter in a marine insurance contract, it's material. The fact is in ñ Why would you ever have any cases about what's material and what's not material if the law is that everything that's in the application is material? There would be no need to have lawsuits or cases about materiality if that were true. Well, I would agree with you. This Court has held ñ this Court has held in the C.N.R. Acton case, and I want to point that C.N.R. Acton case out to this Court, because there they found that it had nothing to do with the risk. It was in the application of the person with a prior criminal record. That person was removed from the boat, gone. Weeks later, this couple of totally innocent out sailing, and the policy was rescinded. But if you have somebody with a criminal record for stealing titles to boats or faking explosions, of course that's going to be material, whether it's in the application or not. But it was in the application. It was. And here the owner was also in the application, and the person in the application didn't own the vessel. And I would say ñ Okay. Okay. Who testified then that if the underwriter had known this was a bare-boat charter, that there would have been no insurance issues? Mr. Nolan testified that, and I cite it in my brief on the page in the record. He testified to that. He said, we only insure owners. We only insure owners. You will not find anything ñ The question was, if ñ where was the testimony that if the insurance company had known this was a bare-bones charter relationship, no policy would have been issued? Where is that? Mr. Nolan testified to that. Specifically to that point. To that point. And where is that in the record? That is in the record. That is in the record. They require an insurance application. If they had been informed he did not have title, he would not have issued the policy. That's the reporter's transcript. That's not the question. The question is, if they had known it was a bare-bones charter ñ A bare-boat charter, Your Honor. Right, right. That there would not have been a policy issued. That's the specific question. I believe it is in the record he said that we don't ñ okay. It's page 7 of my reply brief. Page 6 and 7 of my reply brief. And that exists at the reporter's transcript 269-24 through 278. And what would that be in the record? That's the reporter's transcript.  No, it's the reporter's transcript. Reporter's transcript. What page is it? 269-24 through 278. And it's quoted. That's a pretty long citation for the answer to one question. The answer is ñ I want to put it in there so you can see it. It's on page 6 and 7 of my reply brief. If he is a bare-boat charter, he's clearly not the owner, I ask him. Now, if Mr. McKeegan entered to a bare-boat charter with option to purchase as of May 2, March 2000, by August of 2000 there was another application, if Mr. McKeegan were to sign his application, would you expect the information to be there? Sure. Answer the question. Why? That's an important point for you. Don't you think it should have been included in the excerpts of record? Well, Your Honor, I ñ certainly. But I have understood it, that the reporter's transcript goes with the record and you ñ It goes with the one judge. It doesn't go to all of the judges. Well, then I apologize. Absolutely it's important. And the record is important. And it was my impression that we weren't supposed to enclose reporter's transcripts in the excerpt of record, that that was just for the papers. If you cited in your brief, it probably should be in the record. I agree. And I thought I was by citing the reporter's transcript. But to continue, he said, if he is a bare-boat charter, he's clearly not the owner. And he goes on down. We only cover owners. Well, is that really consistent with the earlier testimony where Mr. McKee told the insurer's agent, I'm buying the boat, I'm not the owner. Correct. Sure, we'll insure you. So that policy should not have been issued, if you believe Mr. Miller. Absolutely. No. When he's saying I'm ñ they would insure if it was an installment purchase contract. But he's not the owner. He could be the registered owner. Just like you buy a car under installment. The title company, the title company, that's where they have the bank lender on the application. The title company says, we hold the title, you're the registered owner. When you finish paying it off, we'll give you the title. Under installment purchase contracts like boats, they would do that if they had all the information. The point here is, the point here is the lawó  Yes. It's distributed. McKee never had title. So the policy should not have been issued. Should have been. He never told them he didn't have the title to the boat. He never told them that. Never told them. Now, Your Honor, the policy was issued after a signed declaration ñ after a signed application is made. We had a telephone conversation in December 1999, and then the requirement is to sign that application to make sure if anything's changed, to fix it. And this Court has held, under the Marine Insurance Code of California, Section 1900, which, by the way, the other side did not try to distinguish, did not mention, and no one on the other side tried to distinguish the C.N.R. Atkin case, which gives the result under Section 1900. Mr. McKeeting was obligated to tell the exact whole truth, even if not asked, under the applicable law of California. As this Court has held in the C.N.R. Atkin case, this Court said it very, very bluntly, that if it's material and it's notóif it's material and it's not put in the application, then underwriter has the right to rescind. The intentóthe intent is irrelevant. Is irrelevant. And I would submit that the C.N.R. Atkin case, harsh result. You could look at that. Sometimes when you apply the law, you have harsh results. The C.N.R. Atkin case very clearly says it, and it's regardless, regardless of intent. And Mr. McKeeting was obligated when he saidówhen they said, has anything changed after he had signed from the first conversation and before he signed that application, he had signed a bare-bolt charter. He had just been visited by the owner a few days previous. You're supposed to have on your mask a sign that you're not the owner. He was obligated to volunteer that information under the applicable law of California, Section 1900. And the other side doesn't even talk about C.N.R. Atkin case because they can't distinguish it. They can't distinguish it. They can'tóthey have toóthis Court follows that. They can't distinguish that. Now, even if not asked, the timeline is important. The timeline is important because you have a first telephone call. You have a signed bare-bolt charter. You have a visit on December 29, and I would call the Court's attentionóit is an important document in the recordó Exhibit Record 118, where the letter was written to Mr. McKeeting, saying you don't own the boat after the visit on December 29, and then he calls BoatUS again on January 5, over a year later from that first conversation, and finally signs, for the first time, the application. Now, BoatUS never saw the bare-bolt charter. And clearly, clearly, I think the lower court got the law wrong because in the findings of fact, they found on Exhibit Record page 122 and also 125, BoatUS representative never asked to see whatever document, if any, existed, never asked who was the title of the registered owner, never asked to see a copy of the title. And then again, after the January 5 telephone conversation, never asked to see whatever documentation, if any, existed. Well, he said nothing changed. Under California law, section 1900, and as interpreted by this Court, Mr. McKeeting had a duty to disclose that information, even if not asked. Clearly, clearly the district court was putting the duty of inquiry on to the insurer, and that is what led to the, in my view, the erroneous result. Also, it was a stipulated fact that the DeWolfs, after the fire, made claim for insurance benefits as owners of that vessel. So here you have an insurer relying on the whole exact truth from their applicant, who signs it, lists himself as the only owner, and now you have a lawsuit and you have this total stranger, you think, total stranger to the boat, total stranger to the contract coming in saying, hey, we're entitled to insurance proceeds. That's what makes it unreal. Four minutes and 52 seconds left. Did you want to save it for rebuttal? Yes. What I would like to say also is that there is no estoppel applicable here because of the obligation to reveal the whole exact truth by the insurer. Thank you. And I will reserve the rest of my time for rebuttal. Thank you. Thank you, Your Honors. Robert Roth for the appellees. From the outset, I think it's very important that the court be cognizant of the trial court's in limine motion prior to trial. You'll find it at supplemental excerpts of records 75 to page 79, and also in the reporter's transcript between pages 178 and 181. That ruling was firemen's refused to produce its manual that would show what the company guidelines were for determining who an owner is. A principle question in this case, the court said, well, you didn't produce your guidelines, therefore, the person that you want to testify who is the head of underwriting, he can testify as to what he would have done if he was underwriting that policy. He may not testify as to overall company policy, and he can't testify as to what the guidelines say. Firemen's could have produced the actual underwriters who were involved in the two applications here. They did not produce those people. There were also two sales reps who took the information from Mr. McKeating, who are no longer with the company, but they could have produced the underwriters. They chose not to. And the district court said, well, I'll allow Mr. Nolan to testify. He's an experienced underwriter. I will take that as an example of what an underwriter might do under these circumstances. But Mr. Nolan's testimony has no weight above that of any other underwriter at the company who was not involved in writing this policy. Now, Mr. the appellant is very adamant about California insurance code section 1900 applying here. And we don't have a qualm with that. But, in fact, all of the California statutory law that's relevant applies here, and we in particular would point the Court to the sections of the Harbor and Navigations Code that talk about who is an owner. And it says that when you have an installment sale contract and somebody is going to receive the boat at the end of the lease period for nothing or a nominal payment, then they are the owner and the lessor is not the owner. So what Mr. McKeating put on that application was very much in line with California law. It's also in line with federal law having to do with bare boat charters. It very much tracks that. So there was no misrepresentation, and that seems to be the underlying assumption here. It's simply not true. Now, Mr. McKeating testified that he told the representative he was buying it over time from a private party. And the representative said to him, well, then we consider you the owner. So when he got the application prepared by Boat U.S., and it said he was the owner, he didn't see anything unusual or alarming about that, and it was entirely proper for him to sign that. Also, nothing in Section 1900 says that the disclosure by the insurer has to be on that page of the application. It doesn't say that you're going to exclude any oral communications that are made to the insurer, particularly when you have a situation where you tell the representative everything that's going on, I'm buying it over time, he provides a survey that shows that the DeWolfs are the owners of this vessel. He gives them all the information. He said, I don't remember if the issue of title came up or not. If they asked me, I would have told them honestly. But the court should keep in mind that in these maritime cases, title is not such a high concept. All it is is the registration. It's like your DMV registration of your car. There's no special certificate that you have title. So it's not surprising that a lender, private lender, would hold on to that as a way of enforcing their lien on the boat. And that's exactly what happened. And both Mr. McKeating and the DeWolfs testified at trial that all the bare boat charter was was a refinance because he had fallen behind. And Fireman's makes a big deal about this one incident that happened where Mr. DeWolf was angry because Mr. McKeating had fallen behind in his payments. That is the only instance in seven years where it's shown that the DeWolfs had anything to do with that boat. And most important here to materiality is it's uncontested that the DeWolfs had no right, until they repossessed the boat, which never happened, they had no right to operate this vessel. It was just — There's no basis in this record to say that this was a bare boat charter, is there? Oh, no, there is a bare boat charter agreement that's in the record. What happened was they refinanced, and the DeWolfs attorney, as the refinanced document — But at the time of the loss, McKeating was obligated to pay the purchase price of the boat by the sales installment program. Was he not? That's correct, Your Honor. The name on the — He did not lose his obligation to pay the rest of the installment. No. Throughout this period, he had to pay. There was a $5 option at the end, so you could say $5 was not an obligation. But otherwise, he had to pay — He was still paying and obligated to pay for the price of the boat. That's right. And the DeWolfs had already — It's not a bare boat charter. That is our point, Your Honor. You can slap whatever name you want on it, but what it really was, and under the California commercial code, which is referenced in this Court's Interpool decision, which I think is very important, this Court said that a provision for purchase at the end of a charter for no additional consideration or for nominal consideration renders the agreement a security instrument as a matter of law. And that's what this really was. That's what the reality of it was. And you could slap any title you want on it, but it was no different than the original installment sale contract. It was just a different mechanism. And everybody testified that the reason that this other mechanism was created was because, since Mr. McKeating had fallen behind, the DeWolfs wanted the peace of mind of having an easier way of repossessing. That's really what was going on. Now, I think also that it's important for the Court to be aware of the testimony at Reporters' Transcript 262, in which Mr. Nolan was asked a hypothetical that involved firemen's getting a copy of either the contract, installment sale contract, or the bare boat charter. And he said that that kind of policy could have been written up with Mr. McKeating as the owner and the DeWolfs as an additional insured. And he also testified at the following page, 263, that additional, when you add a loss payee, that doesn't affect the premium. So where is the materiality here? You know, Mr. McKeating was the one who was using that boat. The DeWolfs had nothing to do with that boat. They were docked three feet away for most of the period of these leases, and the DeWolfs never touched. In fact, they said in the record that, you know, the boat is yours now. You know, he offered, oh, do you want to take it for sale every once in a while? And they said, no, it's your boat now. So that's what the record shows. Now, on the estoppel argument, the Mr. McKeating gave all the relevant information, and there are several California cases that suggest that estoppel applies in the maritime insurance area. Now, if there was a case exactly on point, then, you know, maybe there wouldn't be this appeal. But there are cases all the way around it, and I find it very difficult to believe. And I would cite the Court to cases in our brief, the St. Paul case, the Owen case, the California reclamation case. They all involve marine insurance. They all apply estoppel. And I find it hard to believe that California courts would parse the concept of estoppel in maritime cases and say, well, you can use estoppel in this fact scenario, you can't use it in that fact scenario. I think it's far more reasonable to assume that the California courts would apply estoppel across the board. When an insured gives all the information, they rely on the insurance representative to give them an accurate application. They sign it. The representative said, we consider you an owner. The application says you're the owner. The insurer can't come around later and say, ha-ha, you know, our personnel put it down wrong and told you wrong. Now you've lost your insurance and you can't be covered. You know, I would point the Court to Harbor Navigation Code section 651 and 661, which very strongly shows that in this kind of agreement, it's Mr. McKeating who was the actual owner of the boat, and also the California UCC section 1201, which is referenced in the Interpol case. So unless the Court has further questions, I would submit it. It appears not. Thank you, Your Honor. Thank you. Rebuttal. Mr. Gibson, clarify me on my question. This agreement, was McKeating required to make the installment payment? I know that it was entitled to bear boat charter and option purpose. I only go by what the agreement says, Your Honor, and this is an agreement the underwriters never sign. The agreement says you pay monthly charter hire. And once you pay for the agreed amount of months, then you have an option to purchase for $5. He was not required to pay this vessel off. He could have stopped any time. And if he wanted to buy it, though, he had to pay all those payments and the option to purchase. And that's what it says. The point here is the insurance company was never told about this. They were never told he didn't hold the title. They were never told someone else was a legal owner, never told someone else was paying all the taxes. And those people showed up after a loss and said, we want some of that insurance money. We really own the vessel. And that's a stipulated fact. Now, let me quote for you the courts in limine order, which was, it's at 181 of the transcript. And it's not what was represented to you. I do not believe that it is appropriate. This is the court. I do not believe that it is appropriate to produce all these manuals today. We had them in court. We had them. They were there. So the ruling will be as it was before when you opposed the motion in limine. Well, counsel, let's just stop for a moment. The court was saying if you haven't produced them up until today, it's not appropriate to bring them in here today and try to get them in. We had them there, and we had produced part of them. They wanted more of them. Counsel, do you see the difference between saying you can't, it's not appropriate to introduce them now because you're tardy, and it's not appropriate to introduce them now because they're irrelevant? Those are two different things. I understand that. And I don't think she was saying it was tardy. If I can give the court's ruling, as she reiterated, Judge Ilson, he reiterated her ruling, so the ruling will stand as it was. I will allow Mr. Nolan to testify, as he was beginning to, his experience, what he does and how it is done. I will allow that, and as an example of how it is done in the company, we don't know and perhaps never will know whether it was done that way here, but we will know how he says it should have been done. That verges into the manual. I recognize that, but I'm not allowing the manual as evidence at this time. So you can't rely on the manual as an explanation for these things. I will allow Mr. Nolan to testify as to his experience and what happens in the company. And she allowed that testimony. And when he started talking about policy in that testimony, she overruled those objections or they waived those objections. So his testimony is, we don't insure bare-boat charters. This, the evidence was absolutely relevant and material. When you, when you, the law does not allow the applicant to decide what is material. It's what is material to the underwriter. And they had it, and they had it on, on their application, and they're entitled to the whole exact truth when they do that. So I'm just curious, why weren't the underwriters called? They were, we deemed it was appropriate to have the one who is, who runs the show there, who gives all the directions, and ultimately makes the decisions to testify. He had the most knowledge. The people who actually made the decision on this policy were deemed not to be the best witnesses? They report to him. And by the way, Your Honor, they were never told about a bare-boat charter. That's the whole point. They were never told Mr. McKeegan didn't own the vessel, he didn't hold title. What else would they have testified to? Well, if he says he's the owner and we believe him, then we insure him. That's why the insured is obligated under the law to give the whole exact truth. And you didn't hear one attempt to distinguish the CNR-Atkin case. That's because it can't be distinguished. This is not an installment sales document, Excerpt 100. It's a bare-boat charter. This is what underwriters would have seen had they gotten the whole truth. I would also say failure to reverse the district court's decision will overturn CNR-Atkin, will overturn Section 1900 of the California Insurance Code, and will put the burden on underwriters to inquire as to what is material and will relieve the insured of making that inquiry. And I don't think this Court should do that. I request this matter be reversed with instructions and your judgment of rescission in favor of the insurance company. Thank you, counsel. Thank you to both counsel. The case just argued is submitted for a decision by the Court, and this Court is in recess until 9 o'clock a.m. tomorrow morning. All rise. This Court in recessional stands adjourned. The Court is adjourned.
judges: Reavley, T.G. Nelson, Rawlinson